NO. 07-07-0383-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

JUNE 4, 2009

_____

RONNIE DUANE MASON, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 47TH DISTRICT COURT OF POTTER COUNTY;

NO. 50,138-A; HONORABLE HAL MINER, JUDGE

_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**OPINION**

"The greatest dangers in liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." United States Supreme Court Justice Louis D. Brandeis.[1]

---

[1]*Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (dissent).

Appellant, Ronnie Duane Mason, was convicted by a jury of capital murder. He was then sentenced by the court to an automatic life sentence, the State having waived the death penalty. Appellant's eight issues on appeal can be distilled down to a single question: Did the trial court commit reversible error by denying Appellant's pretrial motion to quash the indictment when the State concedes that the indictment was obtained as the result of a proceeding that violated articles 20.011[2] and 20.04[3] of the Texas Code of Criminal Procedure[4] governing grand jury proceedings? Finding both error and harm, we reverse and remand.

---

[2]Article 20.011 states, in pertinent part, as follows:

a) Only the following persons may be present in a grand jury room while the grand jury is conducting proceedings:

* * *

(4) witnesses while being examined or when necessary to assist the attorney representing the state in examining other witnesses or presenting evidence to the grand jury; . . .

Tex. Code Crim. Proc. Ann. art. 20.011 (Vernon 2005).

[3]Article 20.04 states as follows:

The attorney representing the State may examine the witnesses before the grand jury and shall advise as to the proper mode of interrogating them. No person other than the attorney representing the State or a grand juror may question a witness before the grand jury. No person may address the grand jury about a matter before the grand jury other than the attorney representing the State, a witness, or the accused or suspected person or the attorney for the accused or suspected person if approved by the State's attorney.

Tex. Code Crim. Proc. Ann. art. 20.04 (Vernon 2005).

[4]For convenience, articles of the Texas Code of Criminal Procedure will subsequently be cited as "article ___" or "Article ___."

2

## Background

On June 28, 2004, the Amarillo Police Department and Emergency Medical Services responded to a 911 call concerning a baby not breathing. When Officer Kenneth Jester arrived, there were three adults present: Anthony Richards, Kresha Ryan, and Appellant. The baby the subject of the emergency call was eight-month old Iveyonna Durley. Immediately following first care response, the baby was transported by ambulance to the hospital where she was declared dead on arrival. An autopsy determined the child's death to be the result of multiple blunt force injuries.

During the initial investigation, Richards indicated to the officers that, while he was alone with the baby in his care, she had rolled off a bed and struck her head on a baby walker. Richards further indicated that Appellant and Ryan subsequently arrived and noticed the baby was not breathing, at which time Ryan called 911. Jester permitted Appellant and Ryan to leave the scene in order to locate the infant's mother at her place of work, while he turned Richards over to members of the Special Crimes Unit for further questioning. Richards was subsequently placed under arrest.

During the investigation, Richards gave two oral statements and two written statements to police indicating that, while the infant was in his care, she had fallen from the bed and struck her head on the walker. He also told police that, after Ryan arrived, he picked the infant up, shook her a little and hit her in the face while trying to awake her.

3

Following his arrest, Richards's mother called Sergeant Kevin Dockery, Lead Investigator for the Special Crimes Unit, and told him that Richards had lied to investigators in order to protect his cousin, the Appellant. She also told him to look at a mop handle found in the apartment. Tashana Smith, Richards's cousin, told Sergeant Dockery that Richards told her that Appellant assaulted the infant with the mop handle, kicked the infant from behind, and hit the infant in the head with his fist. Sergeant Dockery subsequently discovered Appellant's fingerprints on the mop handle and began to consider him as a suspect.

In a series of interviews with Sergeant Dockery, Appellant indicated that, on June 27th, he had disciplined the baby by spanking her bare buttocks. He also indicated that, while he was cleaning the apartment on June 28th, he accidently hit the baby in the head twice with a mop handle–once when he threw the mop across the room and a second time when he was attempting to frighten the infant into behaving. Based upon these conversations memorialized by written statements, Sergeant Dockery obtained a warrant and placed Appellant under arrest. Thereafter, Sergeant Dockery neither spoke with Appellant nor Richards until the Grand Jury met to determine whether to indict Appellant.

On January 13, 2005, after being incarcerated for more than six months, Richards met with J. Patrick Murphy, Assistant District Attorney for the Potter County District Attorney's Office. With his attorney present, Richards agreed to go before the Grand Jury that day and give his eyewitness account of the events that occurred on the day of the

child's death. Before the Grand Jury, Richards recanted his earlier statements, testified he had lied to the police to protect Appellant, and he then described how Appellant was responsible for all the infant's injuries.

More specifically, during Murphy's examination of Richards, Sergeant Dockery, and Mike Crandell, a Crime Scene Investigator for the Special Crimes Unit, questioned Richards regarding a number of evidentiary details found at the crime scene that were not covered by Murphy. In several instances, Sergeant Dockery's questions were leading and suggested the answers to Richards. Sergeant Dockery also attempted to rehabilitate Richards's testimony by obtaining Richards's admission he had lied to the police and should be punished for being present but not helping the baby. Sergeant Dockery also elicited new testimony that Richards had told Appellant to stop injuring the baby and, when Richards testified that he never hit or fought Appellant to protect the baby, Sergeant Dockery bolstered his testimony by agreeing that the police "wouldn't expect [Richards] to get into a fight with [Appellant]" in order to protect the baby.

Sergeant Dockery also followed up on a Grand Juror's question related to a cell phone call which Richards claimed in his earlier statements had occurred prior to Ryan's 911 call. In his earlier written statements, Richards had indicated he was alone with the baby when she was injured and that he called Appellant's cell phone to inform him there was something the matter with the baby's breathing. Following the call, Richards indicated Appellant returned to the apartment with Ryan, discovered the baby had ceased breathing,

and Ryan called 911. Before the Grand Jury, however, and in response to Sergeant Dockery's questions, Richards offered new testimony that he had lied about the call and Appellant simply returned to the apartment as expected. Finally, Sergeant Dockery further bolstered Richards's testimony with the following statement:

> All I can say is I do appreciate the fact you did come and talk to us, and I appreciate the fact you stepped forward and talked to us. Hopefully you are telling us the truth. And, all I can say, is good luck to you.

That same day, following Richards's testimony, the Grand Jury indicted Appellant for capital murder.[5] Two weeks later, Richards was released on ten years probation in return for a plea of guilty to injury to a child by omission.[6]

During the course of pretrial proceedings, Appellant filed motions for discovery of the Grand Jury transcripts and materials. In support of his request for the transcripts, he asserted that Richards was the only eyewitness to the events the morning of the baby's death and that he had recanted four earlier statements to police during his Grand Jury testimony. Appellant also asserted the Grand Jury testimony was necessary to effectively cross-examine Richards at trial. The trial court granted the motion.

---

[5]A person commits capital murder if he or she intentionally or knowingly causes the death of a person under six years of age. Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03 (a)(8) (Vernon 2003).

[6]Six months later, Richards was arrested for shooting a person twice in the stomach at a local park and was serving time in prison by the time he was brought to court to testify at Appellant's trial.

After receiving the transcript of Richards's testimony, Appellant filed a motion to quash the indictment because Sergeants Dockery and Crandell were present in the Grand Jury room during Richards's testimony and questioned him before the Grand Jury. On August 20, 2007, the trial court held a pretrial hearing on Appellant's motion to quash. At the hearing, the State admitted the error but questioned whether articles 20.011 and 20.04 served any legitimate purpose. During that hearing, the State made the following statement:

> Well, to be honest with you, Your honor, the secrecy of the Grand Jury has lost a lot of its impact as to why it was written as well. The question should be–and I think is, if we're allowed to have investigators in there to assist us because they know the case better than anybody when it's presented to the Grand Jury, if we're allowed to do that, the fact that they ask the questions rather than the State, doesn't make a lot of sense. The exact reasons why they have the statute is lost on the State. I don't know what the legislative history is on it.

Murphy admitted that "[police] officers have always been [in the grand jury room], as long–that's been the practice from the–from the Potter County perspective as long as I've been there." He also admitted that typically the "Special Crimes people are there," this was the "rare occasion" where they had a witness, and they had developed some changes in his testimony. At the conclusion of the hearing, the trial court found there was error but overruled Appellant's motion to quash after finding the State's error was harmless.

7

Following a six day jury trial, Appellant was found guilty of capital murder. Because the State waived the death penalty, the trial court automatically imposed a life sentence. This appeal followed.

**Discussion**

Appellant contends the State violated articles 20.011 and 20.04 by permitting Sergeants Dockery and Crandell to attend the Grand Jury proceedings in a capacity other than as witnesses and by improperly allowing the officers to question Richards. Appellant contends the officers' presence as well as their questioning of Richards impermissibly influenced the proceedings and effectively commandeered the Grand Jurors in furtherance of law enforcement's investigation. Appellant also asserts that, unless these impermissible practices are checked, the State's violations will continue with impunity. Finally, Appellant contends the error was not harmless.

The State concedes that Appellant's indictment was obtained following a violation of articles 20.011 and 20.04. The State further concedes the trial court erred in failing to grant Appellant's motion to quash; however, it contends that error was harmless. The State asserts that the error "derived from a misunderstanding of the procedural law [regarding grand jury proceedings] rather than a deliberate disregard of that law." The State further contends the information exacted by Sergeants Dockery and Crandell was "only peripheral for later prosecution purposes" and harmless to Appellant. The State relies heavily upon three cases where an intermediate appellate court has found that the questioning of a

8

grand jury witness by an unauthorized person was harmless, *State v. Smith,* 36 S.W.3d 134, 137-38 (Tex.App.–Houston [14th Dist.] 2001, pet. ref'd); *Sanders v. State,* 978 S.W.2d 597, 600-01 (Tex.App.–Tyler 1997, pet. ref'd); and *Hernandez v. State,* 791 S.W.2d 301, 304-05 (Tex.App.–Corpus Christi 1990, pet. ref'd).

## I.      Article 20.011 – 1995 Amendment

In 1995, the Legislature amended the Texas Code of Criminal Procedure by adding provisions intended to promote grand jury secrecy.  *See* art. 20.011.[7]  One provision was the requirement that *witnesses* could be present in the grand jury room while proceedings were conducted if (1) they were being examined, (2) were necessary to assist the state's attorney examining other witnesses, or (3) were necessary to assist the state's attorney in his presentation of evidence to the grand jury.  Art. 20.011(a)(4).  Prior to the enactment of these statutory provisions, the rule in Texas was that, when grand jurors were not deliberating or voting, the presence of persons who had official business in the grand jury chamber, such as police officers, was not discountenanced.[8]  Nevertheless, Texas courts recognized that the "better practice is that only the prosecutor, reporter and witnesses

---

[7]Act of May 24, 1995, 74th Leg., R.S., ch. 1011, 5 Tex. Gen. Laws 5066.

[8]*See Ex parte Rogers,* 640 S.W.2d 921, 924 (Tex.Crim.App. 1982); *Baldwin v. State*, 478 S.W.2d 476, 478 (Tex.Crim.App. 1972); *Minton v. State*, 468 S.W.2d 426, 432 (Tex.Crim.App. 1971); *Tinker v. State*, 95 Tex.Crim. 143, 253 S.W. 531, 532 (1923); *Bridges v. State*, 656 S.W.2d 505, 507 (Tex.App.–Tyler 1983, pet. ref'd), *cert. denied*, 464 U.S. 838, 104 S.Ct. 129, 78 L.Ed.2d 125 (1983).  *See also* Op. Tex. Att'y Gen. No. C-500 (1965).

being interrogated be present." *Ex parte Rogers*, 640 S.W.2d at 924.[9] By enacting article 20.011 with the limiting language contained in subsection (a)(4), the Legislature apparently adopted the "better practice" recognized by Texas courts for the purpose of promoting the independence of the grand jury.

## II.        Article 20.04 – 1989 Amendment

In 1989, the Texas Legislature amended the Texas Code of Criminal Procedure by adding provisions permitting only the State's attorney or a grand juror to question a witness before a grand jury.  *See* art. 20.04.[10]  What began as a single amendment to the Code of Criminal Procedure[11] intended to eliminate the, then, current practice of allowing police officers to question witnesses during grand jury proceedings; House Comm. on Criminal Jurisprudence, Bill Analysis, Tex. CSSB 208, 71st Leg., R.S. (1989),[12] became an omnibus grand jury reform bill aimed at eliminating grand jury abuse.  *See* House Comm. on Criminal Jurisprudence, Bill Analysis, Tex. SB 208 & CSSB 208, 71st Leg., R.S. (1989). [13]

*See also Hernandez v. State*, 791 S.W.2d 301, 305-06 (Tex.App.–Corpus Christi 1990, pet.

---

[9]*Baldwin*, 478 S.W.2d at 478; *Minton*, 468 S.W.2d at 432.

[10]The language of the earlier version was not exclusive: it provided that the State's attorney "may examine the witnesses" and did not contain that language of the current version ("no person other than...") which limits questioning to the State's attorney and  grand jurors.  *See* Act of May 31, 1965, 59th Leg., ch. 722, 1965 Tex. Gen. Laws 317 (amended 1989).

[11]Tex. S.B. 208, 71st Leg., R.S. (1989).

[12]*Available at* http://www.lrl.state.tx.us/legis/billanalyses/billAnalysesSessionViewProc.cfm.

[13]*See id.*

ref'd).[14]  Clearly, the intent of the Legislature was to protect the independence and autonomy of the grand jury by prohibiting police officers from questioning witnesses.

### III.  Harmless Error

We agree that the trial court erred by failing to grant Appellant's motion to quash; however, we are still required to assess the harm, if any, arising from that error pursuant to Rule 44.2 of the Texas Rules of Appellant Procedure.  *See Jasper v. State*, 61 S.W.3d 413, 423 (Tex.Crim.App. 2001) (citing Tex. R. App. P. 42.2(a) as proper standard for addressing constitutional error); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App. 1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999) (citing Tex. R. App. P. 42.2(b) as proper standard for addressing nonconstitutional error).

Although the right to a grand jury indictment is guaranteed by the Texas Constitution; Tex. Const. Art. I, § 10,[15] the failure to adhere to statutory procedures serving to protect this constitutional provision is a violation of the statute, not a violation of the constitutional

---

[14]In *Hernandez*, the evidence indicated that police officers who testified against the accused were present when each other testified before the grand jury and one or more officers directly questioned the accused before the grand jury.  *Hernandez*, 791 S.W.2d at 305.  Nevertheless, the court determined that no case required a trial court to quash an indictment under similar circumstances; *id.* at 304-05 (collected cases cited therein), while noting that the accused was indicted in 1987, nearly two years prior to the Legislature amending article 20.04.  *Id.* at 305 n.1.

[15]Article I provides that "no person shall be held to answer for a criminal offense, unless on indictment by a grand jury," and the accused "shall have the right to demand the nature and cause of the accusation against him, and to have a copy thereof."  Tex. Const. art. I, § 10 (amended 1918).  The Sixth Amendment of the United States Constitution provides similar guarantees.  U.S. Const. amend. VI ("[i]n all criminal prosecutions, the accused . . . shall be informed of the nature and cause of the accusation. . . . ")  This federal constitutional right, however, has not been incorporated and applied to the states through the Fourteenth Amendment.  *See Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962) (every misapplication of state law does not constitute a federal due process violation).

provision itself.  *Chavez v. State,* 91 S.W.3d 797, 800-01 (Tex.Crim.App. 2002); *Ex parte Long*, 910 S.W.2d 485, 486 (Tex.Crim.App. 1995); *Ex parte Sadberry*, 864 S.W.2d 541, 543 (Tex.Crim.App. 1993).  Although the language prohibiting unauthorized persons from questioning witnesses before the grand jury is mandatory, "the violation of a mandatory statute does not, by itself, call for the reversal of a conviction." *Ford v. State*, 73 S.W.3d 923, 925 (Tex.Crim.App. 2002) (error in application of statutory protection subject to harm analysis where protection does not fall within the very limited class of "structural" error immunized from harm analysis). Therefore, because we are addressing statutory violations of articles 20.011 and 20.04, we assess the harm, if any, pursuant to the standard for nonconstitutional error found in Rule 44.2(b).

Pursuant to that standard, any nonconstitutional error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.  Tex. R. App. P. 44.2(b).  A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict.  *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997).  Thus, a criminal conviction should not be overturned for nonconstitutional error if the appellate court, after examining the record as whole, has fair assurance that the error did not influence the jury, or had but a slight effect.  *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App. 1998).  However, if pursuant to a harm analysis of a nonconstitutional error, the court has "grave doubts" about the error's effect on the outcome, it must treat the error as if it did.  *Burnett v. State,* 88 S.W.3d 633, 637-38 (Tex.Crim.App. 2002).

12

### III. Focus of Harmless Error Analysis

A special problem of harmless error analysis is presented when the error consists of a pretrial denial of a sanction or procedural advantage (e.g., dismissal of the indictment) to which the defendant is entitled as a penalty for the violation of another legal requirement (e.g., compliance with articles 20.011 and 20.04). In such a situation as this, the question becomes, should the harmless error analysis focus on the failure to dismiss the indictment (in which case the error would never be harmless because without an indictment clearly the error has had a substantial and injurious effect or influence on the jury's verdict); or, should the analysis focus upon the triggering violation of the legal requirement giving rise to the right to the dismissal? We believe the better reasoned analysis is to focus upon the violation itself.

Furthermore, the State's failure to adhere to the dictates of articles 20.011 and 20.04 are violations affecting the grand jury process and not in any sense trial errors. Therefore, in order to meaningfully conduct a harmless error analysis of such pretrial non-constitutional error, we must focus upon the violation in question and examine whether the purpose of the statutes was thwarted by the error. *See Ford*, 73 S.W.3d at 925-26; *Roethel v. State,* 80 S.W.3d 276, 281 (Tex.App.–Austin 2002, no pet.). In *Ford*, the Court of Criminal Appeals assessed the erroneous denial of a jury shuffle by determining whether the defendant was afforded a randomly selected jury. Finding that the purpose of the statute was not thwarted by the error, the error was found to be harmless. In another case,

13

*Johnson v. State*, 72 S.W.3d 346, 348-49 (Tex.Crim.App. 2002), the Court held that a violation of the requirement that a defendant execute a pretrial written waiver of a jury trial was harmless because the record showed that the purpose of the statute - to ensure that the defendant understood the right he was waiving - was accomplished without the writing.

Similarly, when determining that a harm analysis focusing on the effect of the alleged error on the grand jury's decision to indict was appropriate when considering a violation of Rule 6(d) of the Federal Rules of Criminal Procedure,[16] regarding who was properly present during a grand jury proceeding, Justice O'Connor, in a concurring opinion, wrote, "the logical focus of the harmless error inquiry is an examination of the influence of the error on the charging decision." *United States v. Mechanik,* 475 U.S. 66, 76, 106 S.Ct. 938, 944, 98 L.Ed.2d 50 (1986) (Justice O'Connor, joined by Justices Brennan and Blackmun, concurring).

While not expressly stating that this was the focus of their harmless error analysis, the three cases relied upon by the State have each reached a similar result. In *Smith v. State,* the 14th Court of Appeals found that, although a violation of article 20.04 constituted a deprivation of a "substantial right," that error has harmless because the purpose of the statute was not thwarted because the court could meaningfully gauge the effect of the error

---

[16]Rule 6(d)(1) of the Federal Rules of Criminal Procedure provides:

"**While the Grand Jury is in Session.** The following persons may be present while the grand jury is in session: attorneys for the government, the witness being questioned, interpreters when needed, and a court reporter or an operator of a recording device."

by reviewing it in light of the rest of the witness's testimony *before the grand jury.* 36 S.W.3d at 137. In *Sanders v. State*, the 12th Court of Appeals likewise held that, although a person other than the State's attorney or a grand juror questioned witnesses in violation of article 20.04, that error was harmless because the improper questioning amounted to nothing more than reiterations of earlier *grand jury testimony* that was "either redundant or irrelevant." 978 S.W.2d at 601. Finally, in *Hernandez v. State*, without any real harm analysis, the 13th Court of Appeals held that where the appellant was indicted prior to the amendment to article 20.04, the trial court was not required to quash the indictment where unauthorized persons were permitted to question *grand jury witnesses.* In each instance, the appellate court looked to the impact of the error on the grand jury proceeding, not the trial on the merits.

Therefore, we must determine whether the violations of articles 20.011 and 20.04 "substantially influenced the grand jury's decision to indict, or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (adopting the standard articulated by Justice O'Connor in her concurring opinion in *United States v. Mechanik*, *supra*).

IV.    **Application of Harmless Error Analysis**

In this case, the State concedes that allowing Sergeants Dockery and Crandell to question Richards was error. Therefore, our analysis will focus on the harm caused to

Appellant by this error as it pertains to the Grand Jury's decision to indict Appellant. In conducting our analysis, we review the questions and statements complained of appearing in the record and then analyze the same in relation to the remainder of the witness's testimony before the Grand Jury, "thereby allowing this court to 'meaningfully gauge or quantify the effect of this error.'" *Smith*, 36 S.W.3d at 137 (quoting *Sanders*, 978 S.W.2d at 600). Factors we include in this analysis include: (1) the source of the error; (2) the nature of the error; (3) to what extent the error was emphasized by the State; (4) the error's probable implications; (5) how much weight a grand juror would probably place on the error; and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. *Harris v. State,* 790 S.W.2d 568, 587 (Tex.Crim.App. 1989); *Crocker v. State*, 248 S.W.3d 299, 306 (Tex.App.–Houston [1st Dist.] 2007, pet. ref'd). The existence and severity of these factors are indicative of the harm caused by the improper conduct. *Wilson v. State*, 938 S.W.2d 57, 61 (Tex.Crim.App. 1996). No single factor is dispositive. *Ex parte Werne,* 118 S.W.3d 833, 837 (Tex.App.–Texarkana 2003, no pet.).

Here, the source and nature of the error is troubling. That the error emanated directly from the State with the trial court's, albeit reluctant, approval is significant to our analysis. *See Davis v. State*, 195 S.W.3d 311, 318-19 (Tex.App.–Houston [14th Dist.] 2006, no pet.); *Werne*, 118 S.W.3d at 837. *See also Daniels v. State*, 25 S.W.3d 893, 899 (Tex.App.–Houston [14th Dist.] 2000, no pet.). The trial court denied Appellant's motion to quash, after the State admitted error, stating that, under the applicable appellate standard,

a higher court would inevitably find the State's error harmless.[17]  The harmless error rule is a rule of appellate procedure and the rules of appellate procedure govern procedures in appellate courts and before appellate judges.  *See* Tex. R. App. P. 1.1.  Therefore, the determination of harm is a matter left exclusively to the appellate courts to be applied when reviewing the effect of an error committed by the trial court.  *Salavar v. State*, 118 S.W.3d 880, 885 (Tex.App.–Corpus Christi 2003, no pet.).

Whether, and to what extent, the error was emphasized by the State is, in part, subsumed in our consideration of the previous factor.  But for the State's effort to persuade the trial court that the error was "harmless," this issue would not now be before this Court.  Only because Appellant was able to establish "particularized need" under article 22.02 was he provided the Grand Jury transcripts bringing to light the violations in question.  *See* article 22.02(d), (e).  Clearly, insofar as these statutory provisions were intended to protect the impartiality and integrity of grand jury proceedings, our statutory scheme relies heavily upon the integrity of the State in complying with the appropriate grand jury procedures.  If the State's attorney fails to inform grand jurors that permitting police officers to indiscriminately attend grand jury proceedings or permitting officers to question grand jury witnesses is against the law, how are grand jurors to know?  This is particularly so when

---

[17]After the State conceded error, the trial court was bound under the guiding principles of the law to grant Appellant's motion to quash the indictment.  Applying an appellate standard of review during a pretrial proceeding to deny Appellant's motion to quash constituted an abuse of its discretion.  If the trial court would have granted Appellant's motion to quash, then the State would have had the options of re-indicting Appellant in a legal manner or appealing the trial court's ruling to this Court.  *See State v. Plambeck*, 182 S.W.3d 365, 366, 370 (Tex.Crim.App. 2005); *State v. Eaves,* 786 S.W.2d 396 (Tex.App.–Amarillo 1980), *aff'd*, 800 S.W.2d 220, 224 (Tex.Crim.App. 1990).

17

the State's attorney is the person to whom the grand jurors logically turn for legal advice and direction. To compound the harm arising from these violations by persuading the trial court that any such error is harmless, is to place emphasis on the error in the worst way.

The error's probable implications were that the Grand Jurors were prejudiced against Appellant because Richards's new testimony recanting four previous statements to police was given *imprimatur* through direct questioning by Sergeant Dockery and, to a lesser degree, by Sergeant Crandell. Unlike in *Smith, supra,* and *Sanders, supra,* Sergeant Dockery's questions were not redundant or duplicative of the questions asked by the State's attorney or Grand Jurors. Here, the questions were both unique and relevant. The officers' questions were leading and suggested to Richards facts related to the crime scene. Significantly, Sergeant Dockery also attempted to rehabilitate Richards before the Grand Jury by obtaining admissions that Richards had lied to police on four earlier occasions, but was telling the truth now. The questions bolstered Richards's credibility by painting him as being repentant because he believed he should be punished for not helping the baby. Sergeant Dockery then solicited new testimony that Richards had told Appellant to stop, and he volunteered that the police wouldn't have expected Richards to "get into a fight with [Appellant] to protect the child." Finally, Sergeant Dockery bolstered Richards's testimony by thanking him for testifying before the Grand Jury and expressed his appreciation for Richards "stepp[ing] forward and talk[ing] to us." Although Sergeant

18

Dockery made the statement that "[h]opefully you are telling us the truth," he followed up with a final, salutary comment, "[a]nd, all I can say, is good luck to you."[18]

It is difficult to measure how much weight any Grand Juror placed on Sergeant Dockery's questioning of Richards and Richards's responses because we are unaware of any other evidence that was presented to the Grand Jury other than Richards's testimony. However, despite the glaring inconsistencies of Richards's previous statements to the police, we surmise that Sergeant Dockery's official presence as well as his efforts to rehabilitate and bolster Richards's testimony and credibility were successful because Appellant was indicted the same day.[19]

Notwithstanding assurances to the contrary, there is also a substantial risk of repetition of the State's illegal conduct. That the State acknowledged the error below but still attempted to persuade the trial court to deny Appellant's motion to quash is indicative that, absent direction, this type of error is likely to be repeated. *See Garcia v. State,* 919

---

[18]Until the Grand Jury proceedings, Sergeant Dockery had not spoken with Richards since his last incriminating statement. However, at the hearing on Appellant's motion to quash, Murphy indicated that the officers were present and interrogating Richards because he was an eyewitness and they had "developed some changes in [Richards's] testimony." Ostensibly, Sergeants Dockery and Crandell were present during the Grand Jury proceedings to assure that Richards did not change his story yet again and to highjack the Grand Jury proceedings to further their own investigation into the crime, *i.e.*, as asserted by the State, the information exacted by Sergeants Dockery and Crandell was "only peripheral for later prosecution purposes." The State offered no evidence to indicate that either Sergeants Dockery or Crandell were witnesses before the Grand Jury or that evidence other than Richards's testimony was presented to the Grand Jury.

[19]The State asserts that, prior to questioning by Sergeants Dockery and Crandell, Murphy had already established facts through Richards's testimony sufficient for the Grand Jury to find probable cause. Even if this were so, Richards's testimony would only have value if the Grand Jurors believed he was telling the truth after recanting four prior statements to the police. Sergeant Dockery's principle task, it appears from the transcript, was to bolster and make credible Richards's testimony.

S.W.2d 370, 381 (Tex.Crim.App. 1996) (finding error harmful based in part on risk of repetition, noting that prosecutor offered and trial judge admitted evidence despite knowledge of deficiencies); *Daniels*, 25 S.W.3d at 899-900. *See also Werne*, 118 S.W.3d at 838. Given the extent and duration of the past policy of the Potter County District Attorney's Office to permit law enforcement to indiscriminately attend grand jury proceedings and question witnesses despite statutes to the contrary, their present assurance that unauthorized questioning will not occur in future grand jury proceedings rings hollow.[20] This is particularly so where the State, in argument before the trial court and this Court, appears convinced that violations of these statutory procedures will always be declared "technical" violations representing no more than harmless error. This, in and of itself, is evidence that the State will repeat this error with impunity because two courts found these statutory violations harmless. *See Kelly v. State*, 903 S.W.2d 809, 812 (Tex.App.–Dallas 1995, pet. ref'd).

We cannot countenance the State's purposeful violation of the law. The duty of public officers to follow the letter of the law was aptly described as follows:

> No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the

---

[20] We also find it disingenuous for the State to now claim that it misunderstood a clear prohibition against the conduct at issue in this appeal when the language of articles 20.011 and 20.04, is clear and the statutes have been on the books since 1995 and 1989, respectively.

20

> more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

*United States v. Lee*, 106 U.S. 196, 220, 1 Sup.Ct. 240, 261, 27 L.Ed. 171 (1882). See *Terrell v. Middleton,* 108 Tex. 14, 191 S.W. 1138, 1144 (1917); *Thompson v. State*, 12 S.W.3d 915, 925 (Tex.App.–Beaumont 2000, pet. ref'd) (J. Stover, concurring); *Moses v. State*, 814 S.W.2d 437, 439 (Tex.App.–Austin 1991, pet. ref'd as untimely).

We are mindful that a finding of harmful error here may mean this case will be tried again. Regretfully, witnesses will be inconvenienced and the finality of justice sought by those who were touched by this child's death will be disturbed. Any benefit that society will derive from rendering the just result in this appeal cannot, and will not, assuage the suffering that a second trial may cause those close to the victim. Nevertheless, we are duty bound to uphold the law and follow the old adage that "two wrongs do not make a right." If the State is able to avoid a just result in this case, its prosecutors will be able to violate these statutes with impunity and visit an injustice upon every citizen who comes under scrutiny by a Potter County Grand Jury. The statutory protections, adopted by the Legislature to level the field for an accused, will be substantially eroded and we will be at risk of losing the benefit of statutory procedures intended to protect our constitutional right to indictment if these violations are simply swept aside.

Regarding the cost of a second trial, if one follows, unfortunately this cost would be borne by taxpayers who had no hand in the State's error. This is particularly unfortunate

21

because the State's error, as well as this possible cost, could have been avoided if the State had simply obeyed the law. Something the State requires of its citizens on a daily basis.

Having reviewed the record before us, we find that, no matter how well-meaning the intent of the officers involved, not only is there evidence that the State's violations likely exerted a substantial influence on the Grand Jury's decision, we have a "grave doubt that the decision to indict was free from the substantial influence of [the State's] violations." *See generally Llamas v. State*, 991 S.W.2d 64 (Tex.App.–Amarillo 1998), *aff'd,* 12 S.W.3d 469, 470-72 (Tex.Crim.App. 2000) (error found harmful because court unsure whether testimony had a substantial or injurious effect on jury verdict). Accordingly, we find that the trial court abused its discretion in denying Appellant's motion to quash and the State's violations of articles 20.011 and 20.04 caused harmful error. Appellant's issues are sustained.

**Conclusion**

The trial court's judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

Patrick A. Pirtle
Justice

Publish.

22